Nine-year-old Buford Stanford, Jr., was injured while he was playing with a dart game that he had purchased from Wal-Mart Stores, Inc. ("Wal-Mart"). Buford, through his father, filed an action in a federal district court against Wal-Mart, *Page 235 
seeking damages for his injury under the theory of negligent entrustment. Wal-Mart filed a motion for summary judgment and argued, in part, that Wal-Mart did not have a legal duty to refrain from selling the dart game to Buford. Alabama law controls this case. Klaxon Co. v. Stentor Electric Mfg. Co.,313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Morris v.SSE, Inc., 912 F.2d 1392, 1394 (11th Cir. 1990). Wal-Mart's argument, if accepted, would be determinative of this action.
After reviewing the relevant case law and finding no controlling precedent, the federal court certified the question to this Court pursuant to Rule 18, Ala.R.App.P. The specific question posed is "Did Wal-Mart have a legal duty to refrain from selling the dart game at issue to nine-year-old Buford Stanford, Jr.?" The certificate from the federal district court contains the following statement of facts, with which Buford's father agrees:
 "The defendant Wal-Mart, a Delaware corporation with its principal place of business in Bentonville, Arkansas, operates a nationwide chain of self-service discount stores, including the Wal-Mart store in Daphne, Alabama where young Buford purchased the dart game at issue in this case. Wal-Mart's modus operandi is to produce a high-volume of sales with a minimum of expenses through self-service by customers. The company's merchandise is stocked so that it is readily accessible to its customers who are free to select the products they wish to purchase and pay for the products at cash registers located within a particular department or at cash registers staffed by cashiers at the main check-out area located near the store entrance. Virtually all of Wal-Mart's merchandise is 'bar coded,' allowing cashiers quickly to process the merchandise through the cash registers simply by displaying the bar code on the package over a scanner that electronically identifies the product and registers the price of the product on the cash register.
 "Wal-Mart does not have a store policy that prohibits the sale of any of its products to a particular customer, including a minor, unless the product is covered by state or federal regulations that restrict or prohibit the sale of the product. While Wal-Mart complies with all such regulations regarding the sale of its products, the company will sell any item it stocks to an unaccompanied minor when not prohibited or restricted by a state or federal law or regulation. Moreover, Wal-Mart carries a wide variety of items that contain warnings or notice 'keep out of reach of children,' and these products that have notices or warnings from the manufacturer are not treated any differently by Wal-Mart than products that contain no such notices or warnings. Wal-Mart knows that unaccompanied children as young as nine-year-old Buford shop at its stores and it does not encourage or discourage their patronage.
 "Among the products that Wal-Mart offered for sale on June 19, 1989, was a 'Winners [sic] Choice Deluxe Dart Game' ('the dart game'), which was stocked in the Sporting Goods Department. The dart game consisted of six darts and a dart board with a 'baseball dart game' on one side and a 'target bulls-eye [sic] dart game' on the other. The six darts are made of metal and plastic and have sharp metal points. The dart game includes a set of instructions explaining how to play the various games and how correctly to hang the dart board on the interior wall of a building. The package of the dart game included the following notice to customers in white print: 'A Skillful Adult Game * Not a Child's Toy * May Cause Injury * Read Instructions Carefully.' Wal-Mart had carried this or similar dart games for nearly fifteen years.
 "At approximately 8:00 P.M. on June 19, 1989, Buford's mother Jackie Stanford ('Mrs. Stanford') drove him and his two sisters (twelve-year-old Stephanie and eleven-year-old Misty) to the Daphne Wal-Mart store. Mrs. Stanford, who was acquainted with the Wal-Mart store, having shopped there herself, allowed the three children to go into the Wal-Mart store and shop alone. She did not *Page 236 
give the children any instructions on what they could or could not buy. According to Mrs. Stanford, she had previously talked to an assistant manager at Wal-Mart to confirm that it was permissible for her children to shop alone and she had allowed the children to do so on several occasions.
 "Once inside the store, the children separated and Buford, after shopping a short while, went to the Sporting Goods Department and selected the dart game for purchase. He did not talk to any Wal-Mart employees in the Sporting Goods Department, but instead proceeded to the front of the store and paid for the dart game at one of the cash registers in the main check-out area. Buford did not talk to the cashier when he paid for his merchandise with a ten dollar bill. According to the cash register receipt, Buford purchased the dart game at 8:23 p.m., at which time a total of $5,460.70 in merchandise had been checked out during the day at the same register.
 "After Buford had purchased the dart game, he met his two sisters near the front of the store and one of his sisters telephoned their mother, who drove to Wal-Mart and picked up her three children. On the way home Stephanie rode in the front seat with her mother and Buford rode home in the back seat with his sister, Misty.
 "On the way home from Wal-Mart, Buford told his mother that he had bought the dart game. He had not considered purchasing a dart game before he went to the store and he did not discuss such a purchase with his family beforehand. Before purchasing the dart game Buford had only thrown two darts in his entire life and that had been two or three years before the purchase.
 "When they arrived at home, the children told their mother they were going out to the shed. Buford and his two sisters took the dart game to a shed located behind their house. Buford hung the dart board on the interior wall of the shed and the three children played with the dart game until their mother called them to go to bed approximately fifteen to thirty minutes later. Mrs. Stanford knew that her children were playing with the dart game that evening.
 "The next day, Buford hung the dart board on a tree in his yard. He and Stephanie were joined by a friend, nine-year-old Tarvis Reed. After Buford and Tarvis played darts for a short time, Buford stated that he was going to retrieve one or two darts that had missed the dart board and the tree and sailed over a fence. Before he did so, he told Tarvis not to throw any darts until he returned. Unfortunately, Tarvis either did not hear or heard but did not heed Buford's warning, for he did throw a dart while Buford was standing behind the dart board. The dart struck Buford's eye and, as a result, he later lost the eye.
 "Buford believed that he was old enough to buy the dart game for himself. He understood that it would be dangerous to throw darts at another person and that it would be dangerous to stand behind the dart board while someone else was throwing darts. Buford's parents, on the other hand, did not think he had the age or maturity to play with the dart board."
Buford argues that Wal-Mart's liability is based on the theory of negligent entrustment as stated in Restatement(Second) of Torts § 390 (1965). In Wilbanks v. Brazil,425 So.2d 1123 (Ala. 1983), this Court stated:
 "In Brown v. Vanity Fair Mills, Inc., 291 Ala. 80, 82, 277 So.2d 893 (1973), this Court stated:
 " 'Negligent Entrustment is defined in Restatement (Second) of Torts § 390, as follows:
 " ' "One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to *Page 237 
share in or be endangered by its use, is subject to liability for physical harm resulting to them."
 " 'The elements of negligent entrustment have been listed as follows:
 " ' "(1) Proof that the entrustee was incompetent, inexperienced or reckless; (2) that the entrustor 'knew or had reason to know' of the entrustee's condition or proclivities; (3) that there was an entrustment of the chattel; (4) that the entrustment created an appreciable risk of harm to the plaintiff and a relational duty on the part of the defendant; (5) that the harm to the plaintiff was 'proximately' or 'legally' caused by the negligence of the defendant." See Collins v. Arkansas Cement Co., 453 F.2d 512 (8th Cir. 1972); Woods, Negligent Entrustment: Evaluation of a Frequently Overlooked Source of Additional Liability, 20 Ark. L.Rev. B. Ass'n J. 101 (1966).'
 "This Court then stated: 'Most of the negligent entrustment cases involve automobiles, but the all-embracing term "chattels" used in the Restatement is not restricted to automobiles.' "
Wilbanks, 425 So.2d at 1124-25. Wilbanks involved a parent's allegedly negligent entrustment of a golf club to her minor son. While playing with the golf club, the minor injured Wilbanks, also a minor. Wilbanks's parents filed a personal injury action, relying on the theory of negligent entrustment.
Reviewing the trial court's summary judgment in favor of the defendants, this Court held that a golf club was not so inherently dangerous as to cause liability. This Court stated:
 "In this case, an eight-year-old boy is playing with golf clubs. We opine that it is not negligent to entrust golf clubs to an eight-year-old boy. Golf clubs are items used in playing sports. If it is found to be negligent to entrust golf clubs to an ordinary eight-year-old, then parents would have to keep the golf clubs and similar sports equipment such as baseball bats, tennis rackets, and hockey sticks under lock and key and never allow a child to play with them except when he or she is under some sort of expert supervision.
 "This Court finds that one does not know or have reason to know that an ordinary eight-year-old will likely use a golf club in a manner involving unreasonable risk of harm to others. (See the elements of negligent entrustment stated in Brown v. Vanity Fair Mills, Inc., supra.) Thus, we find that summary judgment was properly granted in this case."
Wilbanks, 425 So.2d at 1125. This Court's determination that no legal duty existed was also based on the parties' relationship as parent and child.
Similar to this Court's analysis in Wilbanks, our analysis of whether Wal-Mart had a legal duty will depend on a consideration of the inherent dangers posed by the dart game and the relationship of the parties, a retailer and a minor. Other important factors for consideration are "the nature of the defendant's activity [and] the type of injury or harm threatened." Morgan v. South Cent. Bell Tel. Co. 466 So.2d 107,114 (Ala. 1985). In the present case, this Court also notes Dean Prosser's comments regarding the determination of a duty in a negligence case:
 "It is fundamental that the standard of conduct which is the basis of the law of negligence is determined by balancing the risk, in the light of the social value of the interest threatened, and the probability and extent of the harm, against the value of the interest which the actor is seeking to protect, and the expedience of the course pursued. For this reason, it is seldom possible to reduce negligence to any definite rules; it is 'relative to the need and the occasion,' and conduct which would be proper under some circumstances becomes negligence under others."
William L. Prosser, Law of Torts § 31, at 149 (4th ed. 1974). Although not exhaustive, these considerations are helpful in determining Wal-Mart's legal duty.
Buford relies primarily on Jones v. Robbins, 289 So.2d 104
(La. 1974). In Jones, a *Page 238 
service station attendant sold a small quantity of gasoline to a six-year-old child. The child carried the gasoline home, where a four-year-old child lit a match and threw it into the gasoline. The gasoline burst into flames and ignited the four-year-old child's dress. The four-year-old child was severely burned. Her parents filed a negligence action against the service station.
In a five-to-two decision, the Louisiana Supreme Court reversed the trial court's summary judgment in favor of the service station. The Louisiana Supreme Court held that the service station had a legal duty to refrain from selling gasoline to the six-year-old child. The Louisiana Supreme Court relied heavily on the inherently dangerous character of gasoline:
 "Gasoline, while not classified as an ultra hazardous substance, is still a dangerous, highly inflammable, and explosive substance. Even when handled by knowledgeable people, it often causes harm because the special care required with its use is not taken. There is little reason to believe that incompetent persons would treat gasoline differently than they would treat water, milk or other liquids which have no dangerous propensities for exploding or becoming ignited. As a general statement, it may be said that the vendor of gasoline has the duty not to place it in the hands of those who, by reason of age or other disabilities, are unaware of the special propensities of the material, and of the precautionary measures which must be taken when using or storing it."
Jones, 289 So.2d at 107. Jones illustrates the consideration of a chattel's "inherently dangerous" character in determining the scope of a retailer's duty to refrain from selling chattels to minors.
The existence of Wal-Mart's legal duty depends, in part, on the inherent danger posed by the dart game. The darts were made of metal and plastic and had sharp metal points. Other jurisdictions have considered the dangerous character of dart games. In Pitts v. Basile, 35 Ill.2d 49, 219 N.E.2d 472 (1966), the Illinois Supreme Court reviewed the question of a wholesaler's liability under Restatement (Second) of Torts § 390 (1965). The court held that darts were not so inherently dangerous as to create liability for a wholesaler. The court reasoned as follows:
 "There are many things used by children that may be said to be unsafe when used for the purpose for which they are intended. A baseball, a baseball bat, a penknife, a Boy Scout hatchet, a bicycle, all have the capacity to injure the user or others in the course of their normal use. They are not, however, to be categorized as 'dangerous instrumentalities.' As was said by the Tennessee court in Highsaw v. Creech, 17 Tenn. App. 573, 69 S.W.2d 249, 252, 'an air gun is not a dangerous instrumentality of itself, but is in fact a toy. * * * The fact alone that an injury may be inflicted by such a toy does not make of it a dangerous instrumentality in the sense that the term is generally used.' In Morris v. Toy Box (1962), 204 Cal.App.2d 468, 22 Cal.Rptr. 572, 574-575, a complaint brought by a minor against a retailer alleging that the retailer knew that the intended user of a bow and arrow was the purchaser's ten-year-old boy was dismissed, the court saying, 'the bow and arrow has been in use by young and old alike for thousands of years. * * * To us it is simply inconceivable that a 10-year-old boy, much less his mother, would be unacquainted with the use of so common an article as the one here in question.' See also, White v. Page (Ohio App. 1950), 105 N.E.2d 652."
Pitts, 35 Ill.2d at 51-52, 219 N.E.2d at 474.
The Oklahoma Supreme Court focused on "lawn darts" inAtkins v. Arlans Dep't Store of Norman, Inc., 522 P.2d 1020
(Okla. 1974), where a minor was injured when a "lawn dart" punctured his skull. In affirming the trial court's dismissal of the action, the court stated:
 "In Maramba v. Neuman, 82 Ill. App.2d 95, 227 N.E.2d 80, the court held that a boomerang, which is used by children, is not a dangerous instrumentality as such, merely because after it is thrown its flight cannot be controlled, anymore than a baseball, a dart or many *Page 239 
other articles, which are classified as toys, can be held to be dangerous instrumentalities.
 "In Larsen v. General Motors Corp., 391 F.2d 495
[8th Cir., 1968], the court stated that almost any chattel or commodity is capable of inflicting injury and when danger is obvious or known to user no warning is necessary and no liability attaches for an injury occurring from reasonable hazards attached to the use of the chattel or commodities. See Dixon v. Outboard Marine Corporation, Okla.
(1970), 481 P.2d 151. A warning that the dart should not be thrown in the direction of anyone would have hardly done more than to apprise even a minor of what he already knew; and the dart was not dangerous to the extent beyond that which would be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics.
 "There are many toys and playthings, perfectly harmless and inoffensive in themselves, but whose common use can be perverted into a dangerous use or design, and there are very few of the most harmless toys which cannot be used to injure another. The dart's propensities to cause injury is demonstrated by the injury sustained but the fact that an injury was sustained does not necessarily mean that the manufacturer or retailer are liable for those injuries."
Atkins, 522 P.2d at 1021-22. As the Oklahoma Supreme Court observed, the world will never be completely "child-proof."[1]
Since Atkins was decided, the Consumer Product Safety Commission has reviewed "lawn darts" and has prohibited them. 16 C.F.R. § 1306.1-.5; § 1500.18(a)(4). In doing so, however, the Commission specifically excluded from its prohibition the type of dart games involved in the present case, "indoor dart games that use a vertically placed target, such as 'English darts' or 'American darts.' " 16 C.F.R. § 1306.4(c)(2). The Commission's express decision not to prohibit the type of darts involved in the present case is noteworthy.
In a factually similar case, a California Court of Appeal refused to impose negligent entrustment liability on the retailer of a toy slingshot. Bojorquez v. House of Toys, Inc.,62 Cal.App.3d 930, 133 Cal.Rptr. 483 (1976). The court stated: "[I]n effect, [the minor plaintiff] asks us to ban the sale of toy slingshots by judicial fiat. Such a limitation is within the purview of the legislature, not the judiciary."Bojorquez, 62 Cal.App.3d at 933, 133 Cal.Rptr. at 484.
This Court has briefly reviewed the Alabama Code and notes that the legislature is aware of its role in the protection of minors and of its ability to protect minors from dangerous products. In several instances, the Alabama legislature has already accomplished this by making the sale of certain products to minors illegal. The products that the legislature has determined to be dangerous to minors include pistols, Ala. Code 1975, § 13A-11-57, bowie knives or knives of similar description, id., cigarettes, § 13A-12-3, and alcoholic beverages, *Page 240 
§ 28-3A-25. The legislature has not, however, suggested that darts are so inherently dangerous as to warrant statutory regulation.
Because the darts in the present case do not present the same degree of hazard as other chattels that are considered inherently dangerous, because the sale of the darts did not violate any state or federal statute or regulation, and because the legislature has not prohibited sales of darts to minors, this Court declines to place on a retailer a legal duty to refrain from selling dart games such as this one to a minor. The certified question is answered in the negative.
CERTIFIED QUESTION ANSWERED.
HORNSBY, C.J., and MADDOX,
SHORES,* HOUSTON, STEAGALL,* and INGRAM, JJ., concur.
[1] In discussing a landowner's liability for injuries to trespassing children, Dean Prosser states:
 "But even though the condition is known, if it is not one from which any unreasonable danger to children is reasonably to be anticipated, there is no negligence in failing to protect them against it, and no liability.
 "The stress here is upon 'unreasonable.' There is virtually no condition upon any land with which a child may not possibly get himself into trouble. He may choke to death upon a green apple, pick up a stick and poke it into his eye, or have his skull fractured by a rock found and thrown by his companion. Unless the possessor is to shoulder the impossible burden of making his land completely 'child-proof,' which might mean razing it to the bare earth, something more is called for than the general possibility of somehow coming to some harm which follows the child everywhere throughout his daily existence. Accordingly, there is a long line of cases involving normally harmless objects, such as a sharp-pointed pole, railroad spikes, a wooden horse, a piece of shingle on a roof, a red lantern, or even stationary vehicles, which have been held to be so innocuous that as a matter of law there was no liability, unless the possessor has some special reason to anticipate injury."
William L. Prosser, Law of Torts § 59, at 369-70 (4th ed. 1974). Although not determinative of whether Wal-Mart owed Buford a legal duty, the difficulty of "child-proofing" a high-volume retail sales operation is a significant consideration.
* Although Justices SHORES and STEAGALL were not present at oral argument, they have listened to the tapes.